UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v.                                                                     )<br>)<br>OSCAR PATINO, a/k/a OSCAR                          )<br>PATINO-BUENO, et al.                                      )<br>) | CRIMINAL NO.<br>03-10331− RGS |

**DEFENDANT OSCAR PATINO'S SENTENCING MEMORANDUM**

This memorandum is submitted on behalf of the defendant Oscar Patino ("Patino") and in the wake of *United States v. Booker*, 543 U.S. 220 (2005) for the purpose of assisting the court in fashioning a sentence "sufficient but not greater than necessary" to meet the statutory purposes of punishment under the provisions of 18 U.S.C. § 3553(a).  Of particular significance is the fact that Patino fully cooperated with the government and provided substantial proactive assistance in the investigation and prosecution of other persons.[1]  As a result Patino will be sentenced with the benefit of a government motion under U.S.S.G. §5K1.1.

**THE CHARGES**

The principal charges against Patino are money laundering charges. Count 1 charged a conspiracy with Claudia Navarro and others in violation of 18 U.S.C. § 1956(h).  Counts 2 through 6 charged specific substantive monetary transactions in funds derived from narcotics trafficking and in

---

[1] Patino was originally the sole defendant.  The other defendants, Claudia Navarro, Ivan Velez, and Daniel Grande, were charged and convicted largely as the result of Patino's substantial assistance.

1

violation of 18 U.S.C. § 1957.  Count 7 charged Patino with structuring certain currency transactions in late May and early June of 2001 in violation of 31 U.S.C. § 5324.

**THE PLEA AND THE PLEA AGREEMENT**

On December 4, 2003, Patino pleaded guilty to all the charges pending against him.  There was a plea agreement, dated November 25, 2003, which Patino acknowledged by his signature on the date of his plea.  The plea agreement was therefore made and the plea entered prior to both *Blakely v. Washington*, 542 U.S. 296 (2004) which was decided on June 24, 2004, and *United States v. Booker*, 543 U.S. 220 (2005) which was decided on January 1, 2005.

Under the plea agreement the government and Patino agreed on the applicable guideline provisions and calculations, with one exception:  Patino preserved his right to argue that he was a minor participant in the criminal activity and that he should receive a two level decrease in his offense level under §3B1.2(b).[2]  The government and Patino agreed that without a role adjustment, Patino's offense level would be level 25 and the guideline range between 57 and 71 months.[3]

The plea agreement contained a cooperation provision and, contingent upon Patino providing substantial assistance in the investigation and prosecution of others, the government undertook to file a motion under guideline §5K1.1 at the time of sentencing and to advise the court "of the full nature, extent and value of the assistance provided."[4]  Patino has

---

[2] Plea Agreement, ¶ 3(h).
[3] Patino was plainly within Criminal History Category I.
[4] Plea Agreement, ¶¶ 9(b) and 9(c).

provided proactive substantial assistance and anticipates the government's filing of a §5K1.1 motion.

The principal factors driving a guideline sentence in this case are (1) the total amount of funds laundered and attributed to Patino and (2) the determination that Patino "knew" that they were derived from drug proceeds.  The government made no concessions to Patino in the plea agreement other than agreement as to acceptance of responsibility, the consequent application of guideline §3E1.1, and an undertaking to file a §5K1.1 motion should Patino provide substantial assistance.  The amount of laundered funds attributed to and accepted by Patino in his plea agreement is the full amount covered in the indictment, approximately $317,000, made up of money orders ($201,600), cash ($89,000) and third party checks ($27,000).  Moreover, Patino accepted specific intent responsibility with respect to the money laundering charges and the drug nexus by acknowledging a "willful blindness."  Although this concept is plainly sufficient to establish criminal liability, it is also a concept that can accept differing degrees of individual culpability.

The Presentence Report calculates a guideline sentence that mirrors the plea agreement calculations.  The Probation Office did not make a role in the offense adjustment and Patino duly objected.  The final Presentence Report was completed on August 3, 2004, shortly after *Blakely* was decided but several months before *Booker* was decided.   Although Patino submits that his culpability is for several reasons less than the culpability of the other defendants, he does not in this post-*Booker* environment intend to press for a role in the offense adjustment.  Section 3553(a) factors are not as inflexible

as specific guideline provisions[5] and are, therefore, more likely to permit truly individualized sentencing. Patino expects to be sentenced for what he did, not for what others did.

**WHO PATINO IS AND WHAT PATINO DID**

Patino is 55 years old. He was born in Colombia but came to the United States, sponsored by a Tyngsboro family, when he was 15 years old. He has resided in the United States ever since. He has only a high school education, having graduated from Lowell High School in 1968, but is an accomplished autodidact. Patino became a naturalized citizen of the United States in 1994.

Patino was the oldest of 12 children and he was the first of his family to come to the United States. His parents and all of his siblings, with substantial assistance from Patino, subsequently immigrated to the United States. Most of them came in the period between 1980 and 1983. All of them have become naturalized, productive and law abiding citizens of the United States.[6] Several of Patino's siblings have sent supportive letters to the court.

Patino has always supported himself but has never been particularly successful financially. In the mid to late 1980s, Patino began working in various capacities with Scott Taylor at an office in Taylor's home in Weston.[7] He worked from that office until he was arrested in August of 2003. The ventures were not particularly successful, and Patino squeezed

---

[5] Counsel for Patino suggests that role in the offense adjustments, particularly downward adjustments, are principally government bargaining chips. In most circumstances they are incompatible with "offense" conduct sentencing under guideline §1B1.3.

[6] One of Patino's sisters was mentally disabled and she passed away in the United States in 2000.

[7] Scott Taylor and Laura Hodges Taylor have each sent supportive letters to the court.

out a modest income at best. He was assisted in many ways financially by the Taylors who always trusted him and who continue to trust him.

In late 1992, Patino visited Colombia and spent approximately a month there. He went to determine whether there was a market in Colombia for the products of certain United States manufacturers he hoped to represent in Colombia. During this visit he met Claudia Navarro. She was an engineering salesperson for a Colombian company that represented Juki Union Special, then known as Union Special. It was an American company that made industrial sewing machines. Ms. Navarro's company represented Juki Union Special in Colombia.

Patino returned to the United States but continued to correspond with Ms. Navarro. The communication was both personal communication and communication about potential joint business opportunities. The business opportunities never developed, but from Patino's perspective at least the personal communication did develop.

Patino did not see Ms. Navarro again until late July of 1995 when she visited the United States for a few weeks. At that time she, with her family, had their own company in Colombia, Universal De Suministros. Among other things, it was the Colombian representative of Juki Union Special. After Ms. Navarro arrived, Patino proposed to her and on August 4, 1995, they were married in Dracut, Massachusetts. On August 13, 1995, a little over a week later, Ms. Navarro returned to Colombia.

It was Patino's understanding that Ms. Navarro would settle family matters in Colombia and then return to the United States to live with him. They would work together in continuing and developing the distribution and representative business in Colombia, but that they would reside in the United States. Ms. Navarro's family members would handle matters in Colombia.

Patino would try to develop new United States manufacturers for representation in Colombia. Patino understood that he would have no claim to income generated from manufacturers that Ms. Navarro already had in place, including specifically Juki Union Special.

Apparently Ms. Navarro had other understandings. Patino did not see her again for a year and a half and thereafter for only a week or two a year. Patino continued to be emotionally attached to Ms. Navarro and hopeful that they would eventually live together but their marriage was hardly traditional. It is doubtful that Ms. Navarro shared his emotional attachment. Their communication by email, telephone and other correspondence, however, continued. Patino attempted to develop new business for Ms. Navarro but without notable success.

In the period prior to the summer of 2000, when Ms. Navarro and Patino opened two accounts in the United States, the Claudia Navarro account and the USCL account, Patino was unaware of any account that Ms. Navarro may have had in the United States. From time to time during this period, Patino did purchase some equipment or materials for Ms. Navarro's customers and he did so through his own accounts. However, funds that came into his accounts to pay for the products were always wire transfers and usually came directly from the accounts of the purchasers. There were no money orders, no third party checks and no cash.

In the summer of 2000, during one of Ms. Navarro's visits, Patino and Ms. Navarro established a Massachusetts corporation, USCL Inc., in which they were each 50% owners. At approximately the same time, they opened two bank accounts, a USCL, Inc account and a Claudia Navarro-Universal de Suministros account. Patino had signature authority on both accounts. This was all done at Ms. Navarro's bidding. She told Patino that it was a

6

matter of convenience and economy for her to have accounts in the United States.

Thereafter Patino used the accounts solely at the direction of Ms. Navarro. Prior to the summer of 2001 when, at Ms. Navarro's urging and direction, Patino made deposits into the accounts of cash and money orders, there did not appear to be anything irregular in the operation of the Navarro and USCL accounts. From time to time, however, Ms. Navarro advised that Patino would receive checks from sources in the United States which he was told to deposit in the accounts. One set of checks was from a former employer of Ms. Navarro who lived in Florida. Ms. Navarro said he had a Colombian credit card, that she paid his credit card expenses, and that his checks were reimbursement. There was a similar story with respect to Ms. Navarro's travel agent. Patino does not recall these payments to be frequent or large and they raised no red flags with him.

In May of 2001, Ms. Navarro asked Patino to go to Miami to take delivery of $100,000 in cash from Ivan Velez. Patino knew him to be an employee and/or owner of the company that shipped Juki Union Special equipment to Colombia. Ms. Navarro told Patino that the funds were to be used to pay a Juki Union bill to one of her customers, Mundo Maquinas. Patino asked why the funds were not paid directly to Juki Union. She replied that the customer insisted on the cash being picked up and if it was not done this way she would lose tens of thousands of dollars and her credit limit with Juki Union would be breached. At the same time, Ms. Navarro assured Patino that Mundo Maquinas was a reputable company and that the money was clean. Patino foolishly acquiesced.

Patino picked up approximately $89,000 and deposited the funds in the USCL account in sums under $10,000. Patino was not directed to

"structure" the deposits in this way.  He was aware that banks reported cash deposits in excess of $10,000, but did not realize that it was a crime to make a series of deposits to avoid the reporting requirement.

In August of 2001, Ms. Navarro advised Patino that he would be receiving money orders that were to be used to pay Mundo Maquinas's bills to Juki Union.  Again Ms. Navarro advised that her "reputable" customer insisted on this method of payment and that without accepting the payment in this form, she would lose substantial sums.  Patino accepted the payments in the form of money orders to assist his wife with whom he still had an emotional attachment.  But after several such payments between August and December of 2001, he advised Ms. Navarro that he would no longer do so.  He had become increasingly uncomfortable and suspicious.

Although he was reimbursed for his trip to Miami, Patino never received any payments for transactions through the USCL and Navarro accounts.  He made the payments that Ms. Navarro directed and deposited the funds that she told him he would receive.  He received no compensation for the conduct that he has now acknowledged was criminal.  Moreover, Patino ceased all illegal activity long prior to his arrest in the summer of 2003 and long before there was any suggestion of an investigation.  Patino continued to assist Ms. Navarro, but Mundo Maquinas was no longer a customer and there were no cash or money order deposits in the accounts.

In early 2003, Patino went to Colombia and visited Ms. Navarro.  It was clear at least at that time that she no longer, if she ever, intended to live with him or have anything close to a normal married relationship.  They decided to divorce.

In mid to late 2002, although it was unknown to him at the time, the government began investigating him using one of his cousins as an

informant and wiring his conversations with her. She attempted without success to get him involved in money laundering activity. There are over thirty wired conversations.

**PATINO'S PROACTIVE COOPERATION**

Patino commenced cooperating with the government almost immediately after his arrest. His cooperation was proactive. Under government supervision he communicated with Ms. Navarro in Colombia, secured her presence in the United States for the stated purpose of completing the divorce, and wore a wire for their conversations when she arrived. He also communicated, under government supervision, with Ivan Velez and thereby secured incriminating statements. Patino was expected to be and was prepared to be the government's principal witness in the trials of defendants Grande and Velez. They did not enter pleas until relatively recently. Patino, although he has been permitted to work, has been in home confinement since his arrest in August of 2003.

Patino anticipates that the government will file a §5K1.1 motion and that it will describe the nature and extent of Patino's cooperation and assistance in glowing terms. At this point, Patino does not know whether the government will make a sentencing recommendation or if it does, what that recommendation might be. Once the motion is filed, the sentence to be imposed is solely within the court's discretion.

**SENTENCING POST *BOOKER***

Even in the absence of a §5K1.1 motion, the sentencing guideline range is no longer binding on the court. It is only one of several factors set forth in the broad language of 18 U.S.C. § 3553(a). In considering these factors, the sentencing guidelines are to be given no more or less weight than any other factor. *See United States v. Jaber*, 362 F. Supp. 2d 365, 370-76

(D. Mass. 2005)(Gertner J.); *United States. v. Ranum*, 353 F. Supp. 2d 984, 987 (E.D. Wis. 2005). Moreover, the primary sentencing mandate of § 3553(a) states that courts must impose the minimally sufficient sentence to achieve the statutory purposes of punishment − justice, deterrence, incapacitation, and rehabilitation: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." I8 U.S.C. § 3553(a).

Patino has led an otherwise blameless life and is hardly a threat for recidivism. Patino sought to assist his wife. He did not seek or obtain any monetary gain. His conduct was naïve and although "willfully blind," was far more blind than willful. Though the period of his criminal conduct extended over several months − May 2001 through early December 2001 − he put an end to the conduct well before his arrest or any notice by others of wrongdoing. Even though his conduct might not constitute a single act under *United States v. Bradstreet*, 135 F.3d 46 (1st Cir. 1998) thereby warranting a guideline departure, it is certainly aberrant conduct properly considered under the more flexible language of § 3553(a).

Particularly given the expected §5K1.1 motion, virtually any sentence below the guideline range is available to the court. Because the government has not indicated what, if any, recommendation it will make, Patino will defer his own request until the time of sentencing. Patino, through his counsel, submits, however, that a very lenient sentence is fully warranted.

By his attorney,

s/ Michael J. Liston

_____
Michael J. Liston BBO# 301760
2 Park Plaza, Suite 610
Boston, MA 02116
(617) 426-2281

February 20, 2006